IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ARTHUR JUNIOR HOPE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:20CV1146 |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Arthur Junior Hope ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on July 30, 2018, alleging a disability onset date of July 23, 2018 in both applications. (Tr. at 13, 193-202.)[2] His

---

[1] Kilolo Kijakazi was appointed as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #9].

applications were denied initially (Tr. at 52-73, 100-04) and upon reconsideration (Tr. at 74-99, 113-28). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 129-32.) On April 8, 2019, Plaintiff, along with his attorney, attended the subsequent telephonic hearing, during which both Plaintiff and an impartial vocational expert testified. (Tr. at 13.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 21-22), and on October 30, 2020, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-5).

## II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270

F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his alleged onset date. The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 15.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> chronic kidney disease, stage III; hypertension; diabetes mellitus; bilateral diabetic retinopathy with macular edema; vitreous hemorrhage with traction detachment of the retina in the left eye; and nuclear sclerosis of the bilateral eyes[.]

(Tr. at 15.) The ALJ found at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 16.) The ALJ therefore assessed Plaintiff's RFC and determined that he could perform light work with the following, non-exertional limitations:

5

> frequent climbing of ramps and stairs; no climbing of ladders ropes or scaffolds; occasional balancing and stooping; no kneeling, crouching or crawling; no jobs requiring full depth perception; and avoid concentrated exposure to dangerous machinery and heights.

(Tr. at 16.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that all of Plaintiff's past relevant work exceeded his RFC. (Tr. at 20.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 21.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 21-22.)

Plaintiff now contends that "the ALJ never adequately explained how the evidence he cites supports his decision that [Plaintiff's] allegations were inconsistent with the objective medical evidence regarding his pain and functional limitations and how the evidence he cites supports his RFC conclusions. [Plaintiff] further contends that the ALJ's decision cannot be supported by substantial evidence since the ALJ failed to explain how he resolves conflicting evidence in the record before reaching his [RFC] findings." (Pl.'s Br. [Doc. #14] at 18.) In other words, Plaintiff asserts that the ALJ (1) failed to consider Plaintiff's subjective complaints in accordance with the regulations, and (2) failed to perform a proper function-by-function analysis in accordance with the Fourth Circuit's guidance. Notably, Plaintiff presents these arguments as a single challenge in his brief, and the Court will therefore consider these contentions together, by first setting out the applicable guidance and then considering the ALJ's analysis in this case.

Plaintiff principally argues that the ALJ failed to properly explain the basis for his RFC assessment. In terms of function-by-function analysis, he contends that the ALJ "fail[ed] to

6

provide a 'logical bridge' explaining how or why the ALJ reached a conclusion at Step 2 that [Plaintiff's] . . . chronic kidney disease as well as his visual impairments were severe and significantly limited his ability to perform basic work activities but then required no corresponding limitation in the RFC." (Pl.'s Br. at 8.) Specifically, Plaintiff argues that the ALJ erred by failing to (1) account for Plaintiff's need to elevate his legs to reduce his documented edema and (2) include visual limitations relating to his "blurred vision and/or fluctuating visual acuity." (Pl.'s Br. at 9, 10.)

As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. SSR 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *1. "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." Monroe v. Colvin, 826 F.3d 176, 179 (4th Cir. 2016) (internal quotations and citations omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from [that] evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted).

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would

7

prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (quoting Cichocki, 729 F.3d at 177). The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. Id. at 637.

Here, Plaintiff contends that the ALJ's failure to include limitations relating to edema and visual acuity—or to explain their absence from the RFC assessment—renders his decision unsupported by substantial evidence. However, as set out below, the ALJ sufficiently relayed his reasons for discounting the need for these additional restrictions. In particular, the ALJ explained that the record as a whole, including the treatment notes, objective testing, and medical opinion evidence, failed to substantiate Plaintiff's subjective complaints regarding the impact of his visual acuity and edema on his RFC.

With respect to the ALJ's evaluation of Plaintiff's allegations regarding his symptoms, under the applicable regulations the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and

8

XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. Moreover, in Arakas v. Comm'r of Soc. Sec., 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit recently clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Arakas, 983 F.3d at 95–96. Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about his pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." Craig, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit his ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529:

    (i)    [Plaintiff's] daily activities;

9

(ii) The location, duration, frequency, and intensity of [plaintiff's] pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [his] pain or other symptoms;
(v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [his] pain or other symptoms;
(vi) Any measures [Plaintiff] use[s] or [has] used to relieve [his] pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

In the present case, as instructed by the regulations, the ALJ considered the entire case record and explained the reasons for deviating from Plaintiff's statements regarding the impact of his symptoms on his ability to work. Whether the ALJ could have reached a different conclusion based on the evidence is irrelevant. The sole issue before the Court is whether substantial evidence supports the ALJ's decision. See Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972) ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'").

Here, the ALJ reviewed the medical evidence, the opinion evidence, Plaintiff's testimony, and the record, and explained the analysis of Plaintiff's subjective complaints. Notably, the ALJ did not conclude that Plaintiff's complaints of edema and vision problems were unsupported by objective evidence. Rather, he found, based on the record as a whole, that the extent to which these symptoms limited Plaintiff's ability to work was not as extensive as Plaintiff alleged. As set out in the administrative decision,

> [Plaintiff] alleged the inability to work due to blurred vision, stage III kidney disease, high blood pressure, heart issues and diabetes. During the hearing, [Plaintiff] reported that left eyed blurriness prevented him from seeing much,

10

> noting that his previous eye surgery helped just a little bit. Further, he reported symptoms of swelling in the lower extremities and the need to elevate his feet as well as the medication side effect of weakness. Overall, [Plaintiff] reported that his chronic impairments limited his activities of daily living such that he could sit and stand for just 20 minutes; walk 5 minutes before experiencing shortness of breath; and lift a gallon of milk. [H]e noted that he could not kneel, reach down or squat; he did not complete household chores; and he stated that his mother helped to put his socks on.

(Tr. at 17) (internal citation omitted). The ALJ acknowledged that Plaintiff experienced limitations from his visual, hypertensive, and diabetes-related impairments, including bilateral pedal edema and significantly impaired vision in his left eye. (Tr. at 18-19.) However, the ALJ also chronicled Plaintiff's ongoing non-compliance with his prescribed treatment throughout the time at issue, as well as symptomatic improvement during periods of compliance.

In terms of Plaintiff's diabetes, chronic kidney disease, and hypertension, the record reflects that, just days after his alleged onset date, Plaintiff was hospitalized due to multiple conditions, including gastroenteritis and complications from uncontrolled diabetes. (Tr. at 18, 372-73.) His symptoms included nausea, vomiting, and diarrhea, which led to acute kidney injury secondary to dehydration. (Tr. at 18, 372-73.) Hospital records also reflect that, prior to his hospitalization, Plaintiff was taking no medications to control his diabetes and that he did not check his blood sugar at home. (Tr. at 18, 381.)

> Thereafter, [Plaintiff] continued conservative treatment via medication therapy with his primary care provider and Nephrologist (4F, 5F, 11F). [Plaintiff's] treatment notes show that he required medication adjustments, including prescriptions for Carvedilol, Hydralazine, Lantus SoloStar, Torsemide, Lancets; and despite episodes of elevated blood pressure with headaches and symptoms of fatigue, vomiting and weakness, notes show good medication tolerance (4F/3, 6; 11F/13, 18, 21, 23). Due to [Plaintiff's] pedal edema, he was also encouraged to wear compression hose and to take an extra pill on days that swelling was noticed. Further, he was instructed to monitor and record blood pressure at home (7F/16). However, the record evidences noncompliance with his treatment regimen, with [Plaintiff] reporting the inability to use insulin due

11

> to financial concerns; he failed to check his blood pressure at home; and notes show that he did not follow a diabetic diet (4F/14; 5F/12; 7F/6, 8, 11). Although [Plaintiff's] Nephrologist noted kidney issues complicated by uncontrolled diabetes, hypertension and anemia, he did not require dialysis treatment (3F/1; 5F/14, 23; 7F/8, 13; 8F/1, 13).
>
> . . .
>
> In early 2019, primary care treatment notes show that [Plaintiff's] sugars remained high, with laboratory studies showing a hemoglobin A1C at 10.6 and he was restarted on insulin (10F/3; 11F/8, 12). During this time, [Plaintiff] was also treated for recurrent pneumonia, edema in the extremities and shortness of breath. Physical examinations showed that breath sounds were clear to auscultation with no wheezes or rhonchi; bilateral 2+ pitting edema; and he was alert and oriented in all spheres (10F/6, 9, 12; 11F/5; 13F/18, 23; 18F/55). [Plaintiff] was started on new medication, including hydrocodone-Acetaminophen for pain and metolazone for short-term treatment of edema; and his provider stressed leg elevation . . . and sodium restriction (11F/5). . . . By April and May 2019, [Plaintiff] also reported that medication greatly help with leg swelling; laboratory studies remained stable and blood pressure was improved; and he failed to keep a pulmonary appointment, noting improved breathing such that he was able to mow his yard without dyspnea (9F/2, 5; 11F/2; 18F/94, 144).
>
> For the remainder of the relevant period, notes show that the claimant's [chronic kidney disease] improved and his treatment regimen was adjusted accordingly; and he continued hypertension medication (12F/4, 7).

(Tr. at 18-19); (see also Tr. at 887, 884-85, 1009, 996, 1003, 1006).

In addition to treatment non-compliance, the above discussion reflects that, although Plaintiff required regular medical appointments and treatment adjustments to control symptoms related to his non-visual impairments, his symptoms improved with these adjustments, particularly after April 2019, when Plaintiff resumed using insulin. Plaintiff testified at his hearing that he spent most of the day with his legs elevated due to pedal edema. (See Tr. at 40-42, 45-46.) He now points to treatment notes in which his providers recommended leg elevation, diuretics, compression socks, and restricted sodium intake to support the ongoing severity and limiting effects of this symptom. However, nothing in the

12

treatment notes cited by Plaintiff and recounted by the ALJ indicates that Plaintiff's provider intended leg elevation to be a full-time, long-term directive. Rather, the treatment records reflect that Plaintiff's primary care provider Dr. Parachuri recommended leg elevation in April 2019 when Plaintiff had increased symptoms (Tr. at 898), but Dr. Parachuri was able to address the symptoms with medication which "greatly helped the leg swelling" (Tr. at 898, 881, 955), such that for the remainder of 2019 the notes from Dr. Parachuri's office reflect that Plaintiff was doing well, his diabetes symptoms were relieved by medication, and he felt well overall with no complaints (Tr. at 881, 955, 957, 994, 996). Plaintiff's nephrologist Dr. Igwemezle treated Plaintiff regularly in 2018 and 2019 but did not mention leg elevation and instead repeatedly set out a plan of care that involved medications, a controlled diet, and compression hose for any swelling (Tr. at 835, 831-32, 828-29, 876-77, 873-74, 1009). The notes from Dr. Igwemezle's office also reflect the effectiveness of the medication with no pedal edema on examination after April 2019 (Tr. at 869-71, 950-52, 948, 1008, 1005, 1002). In addition, Dr. Igwemezie's notes reflect that some swelling may be expected, and Dr. Igwemezie stressed the importance of Plaintiff taking his medication as prescribed, following a diabetic diet, testing regularly at home, and using compression hose/socks for swelling. (See Tr. at 1009.) The ALJ considered these medical records at length, noted the conservative nature of the treatment, noted Plaintiff's improvement when complying with the medication regimen, and relied on the records in concluding that the intensity of Plaintiff's symptoms was not as limiting as Plaintiff alleged.

The ALJ also considered the relevant medical opinion evidence in finding Plaintiff's edema less limiting than alleged. In particular, the ALJ relied on the findings of the State

13

agency medical consultants, Dr. Pyle and Dr. Cox, both of whom found that, despite Plaintiff's symptoms related to his non-visual impairments, he remained capable of light work. (Tr. at 19, 57, 81.) The State agency consultants also found Plaintiff able to frequently stoop, kneel, crouch, crawl, and climb ramps and stairs, and to occasionally balance and climb ladders, ropes, or scaffolds. (Tr. at 19, 58, 81.) Notably, neither consultant indicated any need for leg elevation. The ALJ found the State agency opinions persuasive, but ultimately concluded that, in terms of postural limitations, Plaintiff was more limited than the consultants opined. (Tr. at 16, 19.) Accordingly, the ALJ included further limitations to "no climbing of ladders ropes or scaffolds; occasional balancing and stooping; [and] no kneeling, crouching or crawling" in Plaintiff's RFC assessment. (Tr. at 16.)

Whether the ALJ could have reached a different conclusion based on the evidence is irrelevant. The sole issue before the Court is whether substantial evidence supports the ALJ's decision. See Blalock, 483 F.2d at 775 ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"). As recently noted by the Supreme Court in Biestek v. Berryhill, 139 S. Ct. 1148 (2019), "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is 'more than a mere scintilla.' . . .It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek, 139 S. Ct. at 1154. Here, the ALJ reviewed the medical evidence, the opinion evidence, Plaintiff's testimony, and the record as a whole. He explained his analysis of Plaintiff's subjective complaints, including Plaintiff's assertions that he required

14

leg elevation, as well as his rationale for excluding such a limitation from the RFC finding. Because the ALJ "both identif[ied] evidence that supports his conclusion and buil[t] an accurate and logical bridge from [that] evidence to his conclusion," Woods, 888 F.3d at 694, the Court finds no basis for remand.

The same holds true for Plaintiff's visual limitations. Although Plaintiff contends that the ALJ failed to include limitations relating to his alleged blurred vision, as with Plaintiff's previous challenge, the ALJ adequately explained why he discounted Plaintiff's subjective complaints when formulating his RFC assessment. As set out above, Plaintiff "reported that left eyed blurriness prevented him from seeing much, noting that his previous eye surgery helped just a little bit." (Tr. at 17.) The ALJ noted that, prior to Plaintiff's alleged onset date, "he was assessed with moderate nonproliferative diabetic neuropathy and evidence of a vitreous hemorrhage was found in [Plaintiff's] left eye. Accordingly, he was started on right eye macular photocoagulation treatment for his macular edema and left eye retinal coagulation. . . . During that time, [Plaintiff] was instructed to sleep upright, limit daily activities and remain out of work." (Tr. at 17) (citing Tr. at 307). However, the ALJ noted that "the assessment that [Plaintiff] should remain out of work was time-limited in nature, as evidence[d] by later treatment notes showing improvement with therapy." (Tr. at 17) (citing Tr. at 307, 351). Nevertheless, the ALJ acknowledged that Plaintiff continued to have "slightly blurred vision in the left eye." (Tr. at 17) (citing Tr. at 351).

> On October 29, 2018, [Plaintiff] underwent a retinal evaluation that revealed left eye diabetic macular edema (6F/1). He was also assessed with right eye proliferative diabetic retinopathy, a left eye vitreous hemorrhage, nuclear sclerosis in both eyes and left retina traction detachment (6F/6, 7). With respect to treatment, [Plaintiff] began intravitreal Avastin injections and on December 4, 2018, he underwent a right eye pan-retinal photocoagulation laser treatment

15

(6F/7, 19). Post-operative notes show that he was instructed to avoid any strenuous exercise or heavy lifting following the procedure (6F/31, 41).

(Tr. at 18.) As with Plaintiff's earlier procedure and related limitations, the ALJ again noted that "the limitation[s] [were] time-limited in nature and later notes show that [Plaintiff's] vision improved." (Tr. at 18) (citing Tr. at 814). Indeed, the records reflect that following the procedures in late 2018, Plaintiff's vision was "improving" in March 2019 and had "improved tremendously" by April 2019. (Tr. at 1081, 1145.) In addition, specifically with regard to Plaintiff's visual acuity, the ALJ recounted that, "[i]n June 2019, an eye examination showed that [Plaintiff's] visual acuity was 20/25 in the right eye and 20/80 in the left eye." (Tr. at 19) (citing Tr. at 988). While Plaintiff does point to testing reflecting 20/200 vision (Pl. Br. at 11), that testing was prior to Plaintiff's surgeries (Tr. at 1042), and the post-surgical testing reflects the improvement cited by the ALJ (Tr. at 1166, 1015, 1023, 1031, 1040, 1042), with Plaintiff repeatedly refusing offers for an updated prescription for glasses (Tr. at 1081, 1019, 1036). Most significantly for purposes of Plaintiff's present challenge, the ALJ related that,

> in October 2019, [Plaintiff] reported blurry vision in both eyes and was referred for further evaluation due to suspected glaucoma (17F/5; 18F/128). However, notes show only mild symptoms of glaucoma despite [Plaintiff's] failure to take eye drops as directed. In early 2020, [Plaintiff] inquired about disability and his provider advised that he did not meet the visual criteria for disability. [The ALJ found] this opinion persuasive, as supported by tests showing that [Plaintiff's] vision was stable (17F/31).

(Tr. at 19; see also Tr. at 1042 ("[V]ision stable. . . . Patient inquiring about disability. I advised him he does not meet visual criteria for disability."))

The ALJ further relied on the opinions of the State agency medical consultants, Dr. Pyle and Dr. Cox, who found that Plaintiff had limited depth perception, but specifically concluded that Plaintiff required no further visual limitations. (Tr. at 19) (citing Tr. at 68-69,

16

81-82). In making this finding, the consultants, like the ALJ, relied upon "treatment notes showing visual acuity was 20/25 in the right eye and 20/80 in the left eye." (Tr. at 19, 68-69, 81-82.) Notably, Plaintiff points to no other evidence, other than his own testimony, suggesting a need for additional, vision-related limitations. The ALJ explained that he omitted limitations addressing Plaintiff's alleged blurry vision in light of the record as a whole, which reflected that, despite Plaintiff's failure to fully comply with treatment, his symptoms remained mild and did not result in significantly impaired vision problems upon testing, as set out above. Accordingly, as with Plaintiff's previous contention regarding leg elevation, the ALJ "both identif[ied] evidence that supports his conclusion and buil[t] an accurate and logical bridge from [that] evidence to his conclusion." Woods, 888 F.3d at 694. As such, substantial evidence supports his decision.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Summary Judgment [Doc. #13] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #16] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 15th day of February, 2022.

                                                  /s/ Joi Elizabeth Peake
                                                  United States Magistrate Judge